**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| GLOBAL POWER EQUIPMENT GROUP INC., et al., | Case No. 06-11045 (BLS) |
| | Jointly Administered |
| SNC-LAVALIN POWER ONTARIO, INC., | |
| Appellant, | Case No. 1:08-cv-00025 (JJF) |
| v. | |
| GLOBAL POWER EQUIPMENT GROUP INC., et al., | |
| Appellees. | |

**THE ESTATE REPRESENTATIVES' MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO DISMISS APPEAL OF SNC-LAVALIN POWER ONTARIO, INC. OF THE
BANKRUPTCY COURT'S CONFIRMATION ORDER DATED DECEMBER 21, 2007**

Dated:   February 25, 2008

BAYARD, P.A.
Jeffrey M. Schlerf (No. 3047)
Eric M. Sutty (No. 4007)
Mary E. Augustine (No. 4477)
Kathryn D. Sallie (No. 4600)
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19801
(302) 655-5000

-and-

WHITE & CASE LLP
John K. Cunningham
Frank L. Eaton
Matthew C. Brown
Wachovia Financial Center
200 South Biscayne Boulevard, 49th Floor
Miami, Florida 33131
(305) 371-2700

Attorneys for the Debtors and the New GPEG
Entities

TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................. i

TABLE OF AUTHORITIES .......................................................................... ii

I.      INTRODUCTION AND SUMMARY OF ARGUMENT ...................................... 1

II.     STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS .............. 3

III.    STATEMENT OF FACTS .................................................................................. 4

        A.      Wind Down of the HRSG Business Segment ............................................. 4

        B.      The SNC Completion Agreement and Related Claims ............................... 7

        C.      The Plan ................................................................................................. 8

        D.      SNC's Objection to the Plan .................................................................. 10

        E.      The Effective Date and Substantial Consummation of the Plan ................ 11

IV.     ARGUMENT AND CITATION OF LEGAL AUTHORITY ............................ 12

        A.      The Plan Has Been Substantially Consummated ...................................... 13

        B.      SNC Has Not Obtained a Stay of the Confirmation Order ........................ 15

        C.      The Relief Requested by SNC Would Adversely Affect Third
                Parties .................................................................................................. 17

        D.      The Relief Requested by SNC Would Unravel the Plan ........................... 19

        E.      Public Policy Favors Dismissal of the Appeal ........................................ 21

V.      CONCLUSION .................................................................................................. 22

# TABLE OF AUTHORITIES

## CASES

In re Adelphia Commc'ns Corp.,
    361 B.R. 337 (S.D.N.Y. 2007)..................................................................16

Ronit, Inc. v. Stemson Corp. (In re Block Shim Dev. Co.-Irving),
    939 F.2d 289 (5th Cir. 1991) ..............................................................18

Frito-Lay Inc. v. LTV Steel Co. Inc. (In re Chateaugay Corp.),
    10 F.3d 944 (2d Cir. 1993)..................................................................20

In re Cont'l Airlines,
    91 F.3d 553 (3d Cir. 1996)...........................................12, 13, 14, 15, 17

In re Envirodyne Indus.,
    29 F.3d 301 (7th Cir. 1994) ...............................................................18

In re Genesis Health Ventures, Inc.,
    204 Fed. Appx. 144, 145 (3d Cir. 2006) ............................................13

High River Ltd. P'ship v. Trans World Airlines, Inc.
    (In re Trans World Airlines, Inc.),
    No. 01-0056, 2002 WL 500569 (D. Del. Mar. 26, 2002) ...................19

In re Highway Truck Drivers & Helpers Local Union # 107,
    888 F.2d 293 (3d Cir. 1989).................................................................15

Manges v. Seattle-First Nat'l Bank (In re Manges),
    29 F.3d 1034 (5th Cir. 1994) ...............................................................20

In re Multicare AMC, Inc. v. Genesis Health Ventures, Inc.
    (In re Genesis Health Ventures, Inc.),
    280 B.R. 339 (D. Del. 2002)..........................................................18, 21

Nordhoff Invs., Inc. v. Zenith Elecs. Corp.,
    258 F.3d 180 (3d Cir. 2001)........................................................13, 14, 15

Nordhoff Invs. Inc. v. Zenith Elecs. Corp. (In re Zenith Elecs. Corp.),
    250 B.R. 207 (D. Del. 2000) .......................................................16, 21

Official Comm. of Unsecured Creditors of LTV Aerospace and Def. Co. Inc. v.
    Official Comm. of Unsecured Creditors of LTV Steel Co., Inc.
    (In re Chateaugay Corp.),
    988 F.2d 322 (2d Cir. 1993)................................................................15

In re PWS Holding Corp.,
    228 F.3d 224 (3d Cir. 2000)..............................................13, 14, 19, 20

Republic of Philippines v. Westinghouse Elec. Corp.,
    949 F.2d 653 (3d Cir. 1991)................................................................16

Rochman v. N.E. Utils. Serv. Group (In re Public Serv. Co.),
    963 F.2d 469 (1st Cir. 1992)...........................................................17, 18

Official Comm. of Unsecured Creditors v. SPGA, Inc.
    (In re SGPA, Inc.),
    34 Fed. Appx. 49 (3d Cir. 2002).....................................................13, 14

In re UNR Indus., Inc.,
    20 F.3d 766 (7th Cir. 1994) ...............................................................18

U.S. Trustee v. Official Comm. of Equity Sec. Holders
    (In re Zenith Elecs. Corp.),
    329 F.3d 338 (3d Cir. 2003)................................................................19

## STATUTES

11 U.S.C. § 1101(2) ...........................................................................14

## OTHER AUTHORITIES

Fed. R. Bankr. P. 8011 ........................................................................1

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

Global Power Equipment Group Inc. ("GPEG" and, as reorganized, "New GPEG") and its affiliated debtors as reorganized (collectively, the "Debtors" or the "New GPEG Entities"), together with the Official Committee of Unsecured Creditors (the "Creditors' Committee") and the Official Committee of Equity Security Holders (the "Equity Committee" and, together with the Creditors' Committee and the Debtors, the "Estate Representatives") file this memorandum of law in support of their motion pursuant to Rule 8011 of the Federal Rules of Bankruptcy Procedure to dismiss the appeal (the "Appeal") by SNC-Lavalin Power Ontario, Inc. ("SNC") of the order dated December 21, 2007 (the "Confirmation Order") of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") confirming the First Amended Joint Chapter 11 Plan of Reorganization for Global Power Equipment Group, Inc. and Its Affiliated Debtors (the "Plan").

The confirmation of the Plan, which was overwhelmingly approved and supported by all impaired classes of claims and equity interests, represents the culmination of months of negotiations between the Debtors and the major constituencies in their chapter 11 cases, including the Creditors' Committee and the Equity Committee (collectively, the "Committees"), and the holders of 100% of GPEG's 4.25% Convertible Senior Subordinated Notes (the "Noteholders"). The confirmation and substantial consummation of the Plan marked the conclusion of remarkably successful chapter 11 cases that resulted in payment in full plus interest to all of the Debtors' creditors (other than those in Deltak Class 5) and a meaningful recovery to GPEG's shareholders.

On January 22, 2008, the effective date of the Plan (the "Effective Date") occurred and the New GPEG Entities closed on a $150 million exit financing credit facility and a $72 million rights offering and private placement, and subsequently made distributions from those proceeds of over $130 million directly to or on the behalf of their creditors in accordance with the Plan. In addition, on or about the Effective Date, New GPEG distributed over 139 million shares of new common stock to shareholders. Notwithstanding its opposition to the Plan (which was overruled by the Bankruptcy Court in its entirety), SNC, a sophisticated creditor represented by competent counsel, never attempted to obtain a stay of the Confirmation Order.

Without question, the Plan has now been substantially consummated and, with the distribution of millions of dollars and shares to creditors and shareholders, cannot feasibly be unraveled at this point. Even if it were somehow possible to unravel the Plan and the distributions to creditors and shareholders, as the granting of the relief requested in the Appeal would require, such unraveling would be completely inequitable to all of the creditors and shareholders given SNC's failure to obtain a stay pending appeal of the Confirmation Order.

SNC, the lone dissenter to confirmation of the Plan,[1] cannot be permitted to dismantle the Plan, which is clearly in the best interests of all creditors and shareholders, now that is has been substantially consummated. Accordingly, the Estate Representatives respectfully request dismissal of the Appeal of the Confirmation Order.

---

[1]    All objections to the Plan, other than SNC's objection, were consensually resolved prior to confirmation or through the Confirmation Order.

## II.    STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS

The New GPEG Entities provide power generation equipment to customers in the domestic and international energy and power infrastructure industries, and routine and specialty maintenance services to customers in the utility and industrial sectors.  The New GPEG Entities operate through three primary business groups with facilities in Minnesota, Oklahoma, Massachusetts, Georgia, Mexico, China and The Netherlands.

On September 28, 2006 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), thereby commencing their respective chapter 11 cases (collectively, the "Chapter 11 Cases").

On October 10, 2006, the United States Trustee (the "U.S. Trustee") appointed the Creditors' Committee in the Chapter 11 Cases.  On November 9, 2006, the U.S. Trustee also appointed the Equity Committee.

On October 31, 2007, the Debtors filed their Plan.  Debtors Exh. 77.[2]  All impaired classes of claims and equity interests voted overwhelmingly to accept the Plan and on December 21, 2007, the Bankruptcy Court entered the Confirmation Order. Debtors Exh. 113.

On December 27, 2007, SNC filed its notice of appeal of the Confirmation Order.  SNC Exh. 29.  SNC did not seek a stay of the Confirmation Order pending its Appeal at any time.

---

[2]    Exhibit references related to items identified in the Appellant's Designation of Record and Statement of Issues Pursuant to Federal Rule of Bankruptcy Procedure 8006 are referred to herein as "SNC Exh. __."  Exhibit references related to items identified in The Estate Representatives' Designation of Additional Items for the Record on Appeal are referred to herein as "Debtors Exh. __."

On January 22, 2008, the Debtors satisfied all conditions precedent to the occurrence of the Effective Date under the Plan, the Effective Date occurred and immediately thereafter the Debtors substantially consummated the Plan. See Declaration of Candice Cheeseman in Support of Motion to Dismiss (the "Cheeseman Declaration") ¶ 14.

## III.    STATEMENT OF FACTS

### A.    <u>Wind Down of the HRSG Business Segment</u>

A principal reason for the commencement of the Chapter 11 Cases stemmed from the operational losses incurred by debtor Deltak, L.L.C. ("Deltak") resulting from its heat recovery steam generator ("HRSG") business. Deltak manufactured and marketed HRSGs, which are highly technical and customized industrial units that increase the efficiency of combined cycle power plants by using the hot exhaust emitted by gas turbines to create steam. HRSG units, which typically themselves range from $10 million to $60 million depending upon the particular application, are component parts to much larger power plant projects that may range in the hundreds of millions of dollars. In many cases, the Debtors' HRSG business segment was the sole source provider to these power plants. Similarly, the Debtors' vendors were also sole source providers for the type of labor and supplies necessary to complete the HRSG projects. Debtors Exh. 78 at 49-50.

The HRSG industry is extremely competitive, both in the foreign and domestic markets, and operates under fixed price contracts. As a result of this challenging competitive environment, Deltak posted a net loss of approximately $1.7 million on revenue of approximately $133.8 million as of July 31, 2006, mostly attributable to the HRSG business segment. As of the Petition Date, the HRSG business

segment had a negative aggregate project-to-date gross margin for its HRSG projects and the projected losses for the HRSG projects as of July 31, 2006 totaled approximately $26.6 million. As of the Petition Date, the Debtors expected that the HRSG business segment would continue to incur losses and, absent a cash infusion, would incur future negative cash usage of approximately $22 million for the completion of its outstanding HRSG projects. Debtors Exh. 78 at 49.

The Debtors, after due inquiry, concluded that given the liquidity crisis experienced by the HRSG business segment as of the Petition Date, the projected losses and the absence of a profitable prospective book of business, the HRSG business segment had little to no going concern value, at least in the absence of a substantial infusion of capital beyond its ability to raise. The Debtors determined in their sound business judgment that the only value that could be derived from the business would be through the cessation of the HRSG business segment and the liquidation of its assets through the Chapter 11 Cases, including the rejection of substantially all of Deltak's contracts for the construction and delivery of HRSG units and related services. Debtors Exh. 78 at 49-50.

Although the Debtors determined to wind-down the HRSG business, they recognized that their inability to deliver the HRSG units then under contract would have had a substantial impact on the business objectives of many of the HRSG business segment's customers (the "HRSG Customers") resulting in potentially large damage claims. Notwithstanding Deltak's rejection of the underlying contracts as burdensome to the estates, the Debtors believed that many if not all of the HRSG Customers would still require delivery of the units and would make the necessary financial accommodations to ensure receipt. The Debtors believed that, provided that they could do so at no cost to the

estates, the orderly completion of work in progress would help reduce the hardship endured by employees, customers and vendors resulting from the sudden cessation of HRSG operations and substantially reduce the number of claims against the estates. Debtors Exh. 78 at 50.

Accordingly, on September 29, 2006, the Debtors filed a motion seeking authority to wind down Deltak's HRSG business segment, reject certain related HRSG contracts, and implement procedures for the orderly completion of work in progress (the "Wind-Down Motion"). Debtors Exh. 78 at 50.

Pursuant to final orders entered on October 2, 2006 and October 26, 2006 (collectively, the "Wind Down Order"), the Bankruptcy Court granted the Wind Down Motion in part, authorizing the Debtors to wind down operations of the HRSG business segment operated by Deltak. Debtors Exh. 55.

Additionally, the Wind Down Order authorized the Debtors to negotiate with the HRSG Customers to reach accommodations (the "Completion Agreements") for the completion of work necessary to Deltak's delivery of HRSG units to the HRSG Customers in exchange for each such customer's agreement, at a minimum, to (i) fund all actual costs of completion on time and materials terms, including all outstanding costs owed to vendors and contract employees relating to the completion of such contracts, plus the HRSG Customer's share of any excess costs that would be incurred in the ordinary course outside of the wind-down plan, (ii) fund any contractor incentives offered to contract employees who are retained to perform on such customer's HRSG project, and (iii) waive rejection damage claims to the extent the Debtors complete such customer's HRSG project. The Debtors successfully negotiated ten HRSG Completion

Agreements with certain of the HRSG Customers, including SNC. Debtors Exh. 78 at 50.

**B.    The SNC Completion Agreement and Related Claims**

On January 26, 2006, SNC and Deltak entered into an agreement identified as SNC Purchase Order number 59000010 (the "SNC HRSG Contract"), pursuant to which Deltak agreed to sell HRSGs, accessories and other equipment to SNC and provide related services. Debtors Exh. 78 at 72.

On September 29, 2006, and pursuant to the Wind Down Motion, the Debtors moved to reject the SNC HRSG Contract. Debtors Exh. 78 at 50.

On November 30, 2006, Deltak entered into a Completion Agreement with SNC (the "SNC Completion Agreement"), which, among other things, provides for a cap on the maximum claim SNC can assert in connection with the rejection of the SNC HRSG Contract. Upon the completion of certain performance milestones, SNC's claim "steps down" pursuant to a schedule set forth in the SNC Completion Agreement. Debtors Exh. 78 at 72.

On March 26, 2007, SNC filed a proof of claim in the amount of at least $55,179,000 against Deltak on account of alleged damages arising from the rejection of the SNC HRSG Contract. Debtors Exh. 78 at 73.

On March 26, 2007, SNC also filed an identical proof of claim against GPEG on the basis of an alleged guaranty of Deltak's obligations under the SNC HRSG Contract. Debtors Exh. 78 at 73.

On August 29, 2007, the Debtors filed their objections to SNC's claims (the "Claims Objection"), seeking disallowance of the claim against GPEG and a

reduction of the amount of the claim against Deltak in accordance with the caps set forth in the SNC Completion Agreement. Debtors Exh. 67-68.

On November 5, 2007, the Debtors and the Committees filed a motion to temporarily allow, for voting purposes only, SNC's claim against Deltak in a substantially reduced amount based upon anticipated claim step downs under the SNC Completion Agreement (the "Temporary Allowance Motion"). Debtors Exh. 84.

On December 21, 2007, the Bankruptcy Court entered its order sustaining the Claims Objection and granting the Temporary Allowance Motion (the "Claims Order"). Debtors Exh. 114. On December 27, 2007, SNC filed its notice of appeal of the Claims Order.

C.    **The Plan**

The Plan represents the culmination of months of intensive negotiations between the Debtors and the major constituencies in the Chapter 11 Cases. As a result of these negotiations, the Debtors have successfully confirmed and consummated the Plan. The key components of the Plan are as follows:

- The Plan Support Agreement. On November 30, 2007, the Debtors, the Committees and the Noteholders entered into an agreement (the "Plan Support Agreement"), pursuant to which the Committees and the Noteholders agreed to support a plan of reorganization proposed by the Debtors that contemplated, among other things, a rights offering.

- The Noteholder Settlement. The Debtors, the Equity Committee and the Noteholders entered into an agreement (the "Noteholder Settlement"), pursuant to which the Noteholders agreed to settle their claims (collectively, the "Noteholder Claims") against the Debtors – allegedly in excess of $96 million – in exchange for, among other things, the allowance of the Noteholder Claims in the aggregate amount of $89.7 million and a cash payment on account of the allowed claims on the Effective Date of $86

million, plus accrued interest if the Effective Date did not occur by December 31, 2007.

- The Backstop Stock Purchase Agreement. Certain holders of GPEG's common stock (the "Backstop Investors") entered into that certain securities purchase agreement (the "Backstop Stock Purchase Agreement"), pursuant to which they agreed to fully backstop (i) a rights offering (the "Rights Offering") of New GPEG's common stock, par value $0.01 per share (the "New GPEG Common Stock"), pursuant to which existing equity holders would receive a right to purchase shares of New GPEG Common Stock in accordance with section 1145 of the Bankruptcy Code and (ii) a private placement (the "Private Placement") of shares of New GPEG Common Stock, pursuant to which certain equity holders who were "accredited investors" would receive the right to purchase shares of New GPEG Common Stock in accordance with an exemption from registration under applicable securities laws.

- Payment in Full Plus Interest of All Claims (Other Than Deltak Class 5- Unsecured Claims). The Plan provides for payment in full plus interest to all creditors other than those holding Deltak Class 5 – Unsecured Claims.

- Treatment of Holders of Deltak Class 5 – Unsecured Claims. Under the Plan, the Debtors proposed a settlement to fully resolve numerous issues in controversy with respect to Deltak, including the appropriate treatment of certain alleged GPEG/Deltak intercompany balances (the "Deltak Settlement"). As a consequence of Deltak Class 5 creditors voting in favor of the Plan, pursuant to the terms of the Deltak Settlement, holders of allowed Deltak Class 5 – Unsecured Claims will receive their pro rata share of a $34,000,000 cash distribution (the "Deltak Settlement Amount"), as well as their pro rata share of certain avoidance action recoveries, warranty recoveries and indemnity recoveries (collectively with the Deltak Settlement Amount, the "Deltak Plan Assets"), with all such distributions to be administered by the Deltak Plan Administrator. The New GPEG Entities believe that the Deltak Settlement Amount may be sufficient to pay all of the Deltak Class 5 – Unsecured Claims in full.

- Exit Facility. The Debtors entered into a credit facility (the "Exit Facility") with certain existing postpetition debtor-in-

possession lenders (the "Exit Lenders") pursuant to which they obtained $150 million in exit financing (the "Exit Financing").    The Exit Facility consists of: (a) a $60,000,000 revolving letter of credit facility, including a $10,000,000 cash advance subfacility, and (b) a $90,000,000 term loan.  Approximately $64 million of the Exit Financing has been used to pay off the Debtors' borrowings under their debtor-in-possession credit facility (the "DIP Facility").

See Cheeseman Declaration ¶¶ 4-9.

On or about the Effective Date, each of the key components of the Plan

was seamlessly effectuated —

- $71 million in escrowed funds of the equity investors and the Backstop Investors participating in the Rights Offering and Private Placement, plus $1.5 million raised pursuant to an offer of stock to management, were transferred to the Debtors;

- the Exit Facility closed and the Debtors obtained over $150 million in Exit Financing;

- the proceeds of the Rights Offering, Private Placement and Exit Financing (after payment of the DIP Facility) were used to immediately fund, in the form of wire transfers as well as over 430 checks, the $34 million Deltak Settlement Amount, the $86.286 million Noteholder Settlement, and over $12 million in additional Plan distributions on account of allowed claims against the Debtors, and various other fees and expenses; and

- pursuant to the Rights Offering and Private Placement, 134 million shares of New GPEG Common Stock were distributed following the occurrence of the Effective Date to the participating equity investors, employees and the Backstop Investors, and warrants were issued to the Backstop Investors.

See Cheeseman Declaration ¶ 14.

**D.    SNC's Objection to the Plan**

On December 13, 2007 and December 19, 2007, SNC filed its objection

and supplemental objection (collectively, the "SNC Objection") to confirmation of the

Plan, asserting, among other things, that the Plan (i) failed to satisfy the absolute priority rule because it provides for less than full payment of Deltak creditor claims while allowing GPEG to retain all of its equity interests in Deltak and (ii) was proposed in bad faith, because it was premised upon a waiver of rejection damages by SNC under the SNC HRSG Contract, which waiver was induced through alleged material misrepresentations by the Debtors as to Deltak's intercompany receivables. SNC Exh. 26-27.

On December 21, 2007, after extensive discovery having been taken by SNC and after conducting an evidentiary hearing, the Bankruptcy Court overruled the SNC Objection in its entirety and entered the Confirmation Order. Debtors Exh. 113.

### E.    The Effective Date and Substantial Consummation of the Plan

Under the terms of the Plan Support Agreement, the Noteholder Settlement and the Backstop Stock Purchase Agreement, the Debtors were required to satisfy all conditions precedent to the occurrence of the Effective Date of the Plan within a reasonable period of time following entry of the Confirmation Order, not only to meet the reasonable expectations of creditors and equity holders awaiting their distributions, but also to avoid a number of adverse consequences that could otherwise have been triggered under certain of the Debtors' critical agreements. See Cheeseman Declaration ¶ 11.

First, any delay in the occurrence of the Effective Date would have resulted in the continued accrual of postpetition interest on allowed claims (including the accrual of interest on the $86 million Noteholder Claims at a rate of 6.75% commencing on January 1, 2008). As a consequence of finalizing the terms and conditions of the Exit

Facility and the closing on the Effective Date, the Debtors were required to pay the Noteholders approximately $286,000 in accrued interest.  Had the Effective Date not occurred prior to January 31, 2008, the Debtors' exclusive period within which to file a plan of reorganization would have automatically terminated with respect to the Creditors' Committee and the Noteholders under the Plan Support Agreement, thereby allowing such parties to file competing plans of reorganization, and the Noteholders would have been entitled to accrue interest on their allowed claims at a default rate of 9.25% as of January 1, 2008 under the Noteholder Settlement.  Debtors Exh. 82.

Additionally, had the Effective Date not occurred prior to January 31, 2008, the Plan Support Agreement would have automatically terminated.  Debtors Exh. 80.  In such event, the prolonged stay in chapter 11 and changes in market conditions may have made it difficult if not impossible for the Debtors to renegotiate a consensual plan of reorganization with the Committees and the Noteholders.  Finally, the occurrence of the Effective Date on or before January 31, 2008 was a condition precedent to the Exit Lenders' obligations to extend financing under the Exit Facility.  Debtors Exh. 108.

Accordingly, on January 22, 2008, the Debtors satisfied all conditions precedent to the occurrence of the Effective Date (as set forth in Section 14.2 of the Plan), the Effective Date occurred, and the Debtors substantially consummated the Plan.  See Cheeseman Declaration ¶ 14.

## IV.    ARGUMENT AND CITATION OF LEGAL AUTHORITY

Because the Plan has been substantially consummated, the Appeal of the Confirmation Order must be dismissed as equitably moot under applicable Third Circuit authority.  Under the doctrine of equitable mootness, an appeal should be "dismissed as

moot, even though effective relief could conceivably be fashioned, where implementation of that relief would be inequitable." In re Cont'l Airlines, 91 F.3d 553, 559 (3d Cir. 1996); In re Genesis Health Ventures, Inc., 204 Fed. Appx. 144, 145 (3d Cir. 2006) (hereinafter, "Genesis II") (same). The equitable mootness doctrine "prevents a court from unscrambling complex bankruptcy reorganizations when the appealing party should have acted before the plan became extremely difficult to retract." Nordhoff Invs., Inc. v. Zenith Elecs. Corp., 258 F.3d 180, 185 (3d Cir. 2001) (hereinafter, "Nordhoff II").

      In determining whether dismissal for equitable mootness is warranted, the Third Circuit has set forth the following five factors to consider: (1) whether the reorganization plan has been substantially consummated; (2) whether a stay has been obtained; (3) whether the relief requested would affect the rights of the parties not before the court; (4) whether the relief requested would affect the success of the plan; and (5) the public policy of affording finality to bankruptcy judgments. Genesis II, 204 Fed. Appx. at 145-46. The facts in this case overwhelmingly satisfy each of these factors and clearly support dismissal of the Appeal.

### A.    The Plan Has Been Substantially Consummated

      In determining whether to dismiss an appeal on the grounds of equitable mootness, "the foremost consideration is whether the reorganization plan has been consummated." In re PWS Holding Corp., 228 F.3d 224, 236 (3d Cir. 2000); Genesis II, 204 Fed. Appx. at 146 (same). Indeed, the Third Circuit has "explicitly and repeatedly stated that the five factors are to be given varying weight and that the substantial consummation factor takes priority." Official Comm. of Unsecured Creditors v. SPGA, Inc. (In re SGPA, Inc.), 34 Fed. Appx. 49, 51-52 (3d Cir. 2002); see also Nordhoff II, 258

F.3d at 185; PWS, 228 F.3d at 236; Cont'l Airlines, 91 F.3d at 560. "Substantial consummation" is defined in the Bankruptcy Code as: "(A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan." 11 U.S.C. § 1101(2).

Without question, the Debtors have substantially consummated the Plan. In particular, the Debtors have (i) transferred substantially all of the property proposed by the Plan to be transferred, including (a) the Deltak Settlement Amount of $34 million and the other Deltak Plan Assets to the Deltak Plan Administrator and (b) millions of shares of New GPEG Common Stock to the Rights Offering and Private Placement investors, including the Backstop Investors, and employees participating in the management stock offering; (ii) assumed all property as proposed under the Plan, including the assumption of certain executory contracts and payment of cure costs in association therewith; and (iii) commenced distributions under the Plan, including payment in cash of the Noteholder Claims in the amount of $86 million plus interest. It would be an administrative nightmare (if even possible) to unwind these transactions at this point. For example, 134 million shares of New GPEG Common Stock have already been issued pursuant to a complex Rights Offering and Private Placement, which shares may have subsequently been sold to numerous unknown third parties. Indeed, available information indicates that such trading has already commenced. Moreover, the Debtors have already distributed approximately $132 million on account of the Deltak Settlement and allowed claims against the Debtors under the Plan in the form of wire transfers as

well as the issuance of over 430 checks, a significant portion of which have likely already been cashed.

In short, the substantial consummation factor, which is given the foremost consideration by the Third Circuit, weighs heavily in favor of concluding that SNC's Appeal of the Confirmation Order is equitably moot and should therefore be dismissed.

**B.**    **SNC Has Not Obtained a Stay of the Confirmation Order**

The Third Circuit has held that it is incumbent on the appellant to obtain a stay where its appeal of an order could otherwise become moot. See, e.g., Nordhoff II, 258 F.3d at 186-87 (stating that it "is obligatory upon appellant . . . to pursue with diligence all available remedies to obtain a stay of execution of the objectionable order . . . if the failure to do so creates a situation rendering it inequitable to reverse the orders appealed from." (citing In re Highway Truck Drivers & Helpers Local Union # 107, 888 F.2d 293, 297 (3d Cir. 1989))); see also Cont'l Airlines, 91 F.3d at 566 ("There was a clear possibility the [appellants'] claims would become moot after consummation of the plan, and it was therefore incumbent on the [appellants] to obtain a stay."); Official Comm. of Unsecured Creditors of LTV Aerospace and Def. Co. Inc. v.  Official Comm. of Unsecured Creditors of LTV Steel Co., Inc. (In re Chateaugay Corp.), 988 F.2d 322, 326 (2d Cir. 1993)  ("The party who appeals without seeking to avail himself of that [stay] protection does so at his own risk.").

Despite the fact that the Appeal has been pending for over a month, SNC never even attempted to obtain a stay of the Confirmation Order.  To do so, SNC would have needed to demonstrate that it was entitled to such stay based on a balancing of several factors, including the likelihood of success on the merits, irreparable harm absent

the stay, and the effect of the stay on other parties.  See, e.g., Republic of Philippines v. Westinghouse Elec. Corp., 949 F.2d 653, 658 (3d Cir. 1991).  The Debtors believe that the Appeal is completely without merit and, correspondingly, there could be no irreparable harm to SNC absent the stay.  Further, as described above, staying the Effective Date of the Plan would likely have triggered numerous adverse consequences under certain of the Debtors' critical agreements to the detriment of the Debtors' estates, creditors and shareholders.  As such, the Debtors believe that SNC would have failed in any attempt to obtain a stay pending its Appeal.  At a minimum, however, SNC would have been required to post a substantial bond to obtain a stay of the Confirmation Order. See, e.g., In re Adelphia Commc'ns Corp., 361 B.R. 337, 351 (S.D.N.Y. 2007) ("If a stay pending appeal is likely to cause harm by diminishing the value of an estate . . . and there is no good reason not to require the posting of a bond, then the court should set a bond at or near the full amount of the potential harm to the non-moving parties.").

Given that SNC is a sophisticated creditor represented by competent counsel, it appears that SNC made the tactical decision to avoid the costs associated with seeking a stay pending its Appeal, including the posting of a bond.  As a consequence of such inaction, SNC permitted the Effective Date to occur and the Plan to be substantially consummated, and cannot now be allowed to dismantle the Plan.  See, e.g., Nordhoff Invs. Inc. v. Zenith Elecs. Corp. (In re Zenith Elecs. Corp)., 250 B.R. 207, 215 (D. Del. 2000) (hereinafter, "Nordhoff I") (stating that "the failure to even seek a stay would seem to have significance beyond the mere failure to obtain a stay").  Accordingly, the Appeal is now equitably moot and should be dismissed.

C.    <u>**The Relief Requested by SNC Would Adversely Affect Third Parties**</u>

"High on the list of prudential considerations taken into account by courts considering whether to allow an appeal following a consummated reorganization is the reliance by third parties, in particular investors, on the finality of the transaction." <u>Cont'l Airlines</u>, 91 F.3d at 562. This equitable mootness factor is particularly important here given the numerous investors and financial institutions (e.g., the shareholders that participated in the Rights Offering and Private Placement, the Backstop Investors and the Exit Lenders) that have relied on the finality of the unstayed Confirmation Order in consummating their respective transactions under the Plan. As stated in <u>Continental Airlines</u>:

> [W]e should ask whether we want to encourage or discourage reliance by investors and others on the finality of bankruptcy confirmation orders. The strong public policy in favor of maximizing debtors' estates and facilitating successful reorganization, reflected in the Code itself, clearly weighs in favor of encouraging such reliance. Indeed, the importance of allowing approved reorganizations to go forward in reliance on bankruptcy court confirmation orders may be the central animating force behind the equitable mootness doctrine. Where, as here, investors and other third parties consummated a massive reorganization in reliance on an unstayed confirmation order that, explicitly and as a condition of feasibility, denied the claim for which appellate review was sought, the allowance of such appellate review would likely undermine public confidence in the finality of bankruptcy confirmation orders and make successful completion of large reorganizations like this more difficult.

91 F.3d at 565 (citations omitted).

Courts have been particularly hesitant to grant relief that would "adversely affect investors in the reorganized [company] who acted in legitimate reliance on the order of confirmation in the absence of a stay." <u>Rochman v. N.E. Utils. Serv. Group (In</u>

re Public Serv. Co.), 963 F.2d 469, 475 (1st Cir.), cert. denied, 506 U.S. 908 (1992)

(dismissing appeal as moot in part based upon investors' reliance upon unstayed

confirmation order); see also In re Envirodyne Indus., 29 F.3d 301, 304 (7th Cir. 1994)

(court must consider "effects of the relief on innocent third parties . . . if modification of a

plan of reorganization would upset legitimate expectations, it may be refused" (citations

omitted)); Ronit, Inc. v. Stemson Corp. (In re Block Shim Dev. Co.-Irving), 939 F.2d

289, 291 (5th Cir. 1991) (dismissing as moot bankruptcy appeal seeking relief which

would adversely "affect third parties' rights"). As the Seventh Circuit has explained:

> [I]t is the reliance interests engendered by the plan, coupled
> with the difficulty of reversing the critical transactions, that
> counsels against attempts to unwind things on appeal.
> Every incremental risk of revision on appeal puts a cloud
> over the plan of reorganization, and derivatively over the
> assets of the reorganized firm. People pay less for assets
> that may be snatched back or otherwise affected by
> subsequent events. Self-protection through the adjustment
> of prices may affect the viability of the reorganization . . . .
> By protecting the interests of persons who acquire assets in
> reliance on a plan of reorganization, a court increases the
> price the estate can realize *ex ante*, and thus produces
> benefits for creditors in the aggregate.

In re UNR Indus., Inc., 20 F.3d 766, 770 (7th Cir. 1994).

Here, creditors, shareholders, the Noteholders, the Backstop Investors, the

Exit Lenders and others have relied on the finality of the unstayed Confirmation Order

and the transactions effectuated under the Plan. The Exit Lenders relied upon the finality

of the Confirmation Order in extending over $150 million in exit financing to the

Debtors. See In re Multicare AMC, Inc. v. Genesis Health Ventures, Inc. (In re Genesis

Health Ventures, Inc.), 280 B.R. 339, 344 (D. Del. 2002) (hereinafter, "Genesis I")

(finding that exit lenders had relied upon the finality of the confirmation order in

extending financing to the debtors).  Similarly, equity holders have relied on the finality of the Confirmation Order in consummating their investment of $72 million in the Private Placement and Rights Offering, and creditors have relied on the finality of the Confirmation Order in cashing their Plan distribution checks.  As noted above, it would be an administrative nightmare, if not impossible, to unwind the transfer of 134 million shares of New GPEG Common Stock and approximately $132 million distributed on account of the Deltak Plan Settlement and allowed claims against the Debtors under the Plan.  Accordingly, this equitable mootness factor weighs heavily in favor of dismissing the Appeal.

>           **D.        The Relief Requested by SNC Would Unravel the Plan**

Under the fourth equitable mootness factor, "[i]f the relief an appellant requests has an 'integral nexus' with the reorganization plan such that it would cause the 'reversal or unraveling' of the plan, then dismissal for equitable mootness is favored." High River Ltd. P'ship v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.), No. 01-0056, 2002 WL 500569, at *2 (D. Del. Mar. 26, 2002) (citing PWS, 228 F.3d at 236); see also U.S. Trustee v. Official Comm. of Equity Sec. Holders (In re Zenith Elecs. Corp.), 329 F.3d 338, 344 (3d Cir. 2003) (citing PWS, 228 F.3d at 236).

In its Appeal, SNC contends, however unfounded, that the Plan was not proposed in good faith, effectuated an impermissible substantive consolidation, was not fair and equitable, violated the absolute priority rule and was not feasible.  Each of these contentions, if found to be true, would cause the Plan to fail and the Debtors' creditors and equity holders to suffer irreparable injury.  If the Debtors were forced to renegotiate the Plan and undo all transactions authorized in accordance therewith, distributions on

account of all claims (including any potential claim of SNC)[3] could be significantly reduced. Indeed, the only apparent explanation for SNC's failure to seek a stay of the Confirmation Order pending its Appeal, which fact alone is generally fatal to the success of any appeal, is that SNC recognizes that it could actually be worse off if the Plan was unraveled, and is simply prosecuting the Appeal in an attempt to gain negotiating leverage with the Debtors in connection with its potential unsecured claim against Deltak.

The Plan (which was voted upon and approved by all impaired classes of claims and equity interests) was the result of numerous compromises, and represents a delicate balance of negotiations between the Debtors, the Committees, the Noteholders and the Backstop Investors over the course of many months. If SNC were successful in its Appeal, it could "knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation" with respect to the Plan, including, but not limited to, the Plan Support Agreement, the Noteholder Settlement, the Deltak Settlement, the Rights Offering, the Private Placement, the Backstop Stock Purchase Agreement and the Exit Facility. Frito-Lay Inc. v. LTV Steel Co., Inc. (In re Chateaugay Corp.), 10 F.3d 944, 952-53 (2d Cir. 1993) (quotations omitted); see also PWS, 228 F.3d at 236. Simply put, it would be "nothing short of a disaster for the bankruptcy court and the parties before it" if SNC were to succeed in its Appeal and thereby unravel the Plan. Manges v. Seattle-First Nat'l Bank (In re Manges), 29 F.3d 1034, 1043 (5th Cir. 1994).

---

[3]    The Debtors believe that they will continue to be successful in achieving the milestones under their various Completion Agreements, including the SNC Completion Agreement, and anticipate that SNC's claim will ultimately be reduced to $0 in accordance with the SNC Completion Agreement.

E.    **Public Policy Favors Dismissal of the Appeal**

Although identified by the Third Circuit as a separate factor, the public policy favoring the finality of bankruptcy judgments has been described as "the lens through which the other equitable mootness factors should be viewed." Nordhoff I, 250 B.R. at 219.  As stated by this Court in Genesis I:

> Public policy weighs in favor of facilitating quick and successful reorganizations of financially troubled companies.  This policy is furthered by the policy favoring finality of bankruptcy judgments. When investors and other third parties can rely on confirmed plans of reorganization and other bankruptcy judgments, they have the footing and confidence they need to pursue investments and business arrangements with the reorganized debtor, all of which foster the debtor's successful reorganization.

280 B.R. at 346-47.

As noted above, numerous third parties have relied on the finality of the unstayed Confirmation Order.  The relief SNC seeks through this Appeal would unravel a substantially consummated reorganization plan for which a stay pending appeal was neither sought nor obtained, and would thereby undermine the finality of the Confirmation Order to the detriment of all who relied upon such finality.  Accordingly, the public policy favoring the finality of judgments clearly supports dismissal of SNC's Appeal.

## V.    CONCLUSION

Based on the foregoing, the Estate Representatives request that this Court grant the relief requested herein and dismiss SNC's Appeal of the Confirmation Order in its entirety.

Dated:  Wilmington, Delaware
        February 25, 2008

                        BAYARD, P.A.

                        By: _____
                        Jeffrey M. Schlerf (No. 3047)
                        Eric M. Sutty (No. 4007)
                        Mary E. Augustine (No. 4477)
                        Kathryn D. Sallie (No. 4600)
                        222 Delaware Avenue, Suite 900
                        Wilmington, Delaware 19801
                        (302) 655-5000

                                -and-

                        John K. Cunningham
                        Frank L. Eaton
                        Matthew C. Brown
                        WHITE & CASE LLP
                        Wachovia Financial Center
                        200 South Biscayne Boulevard, 49th Floor
                        Miami, Florida 33131
                        (305) 371-2700

                        Attorneys for the Debtors and the New
                        GPEG Entities

Adam G. Landis, Esquire
Kerri K. Mumford, Esquire
LANDIS RATH & COBB LLP
919 Market Street, Suite 600
Wilmington, DE 19801

      - and -

Jeffrey S. Sabin, Esquire
David M. Hillman, Esquire
Brian Kohn, Esquire
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, NY 10022

Attorneys for the Official Committee of
Unsecured Creditors


Mark Minuti, Esquire
Jeremy W. Ryan, Esquire
SAUL EWING LLP
222 Delaware Avenue, Suite 1200
Wilmington, DE 19801

      - and -

Howard L. Siegel, Esquire
Stephen Pohl, Esquire
BROWN RUDNICK BERLACK ISRAELS
LLP
CityPlace
185 Asylum Street
Hartford, CT 06103-3402

Attorneys for the Official Committee of
Equity Security Holders